MILLER BROTHERS v DEPARTMENT OF NATURAL RESOURCES

CARNAGEL OIL ASSOCIATES v DEPARTMENT OF NATURAL RESOURCES

Docket Nos. 145198, 145199, 150573, 150574. Submitted August 3, 1993, at Grand Rapids. Decided February 22, 1994, at 9:25 A.M. Leave to appeal sought.

Miller Brothers, a Michigan copartnership, Carnagel Oil Associates, and others, brought actions in the Court of Claims against the Department of Natural Resources and the director of the department in his capacity as Supervisor of Wells, seeking under a theory of inverse condemnation damages resulting from the director's designation of a 4,500-acre area in Mason County as the Nordhouse Dunes Area, his finding that oil or gas development in the area would constitute waste prohibited by law, and his determination that no oil or gas exploration or development would be permitted in the area. The plaintiffs are owners of oil and gas rights in the protected area or developers who had leased oil and gas rights from the owners of those rights and who had been preparing to develop the area's oil and gas potential. The federal government is the surface owner of the land in question. The court, Peter D. Houk, J., consolidated the actions and granted the plaintiffs' motion for summary disposition, finding that the director's decision amounted to a taking. After a trial to resolve the issue of damages, the court entered an order granting the plaintiffs a judgment of $71,479,000 as just compensation for the property taken and ordering the plaintiffs to transfer their property rights to the state upon receipt of the just compensation. The court, by separate order, also granted the plaintiffs costs and attorney fees. The defendants appealed from both orders and the plain-

REFERENCES

Am Jur 2d, Eminent Domain §§ 157, 167, 170, 266, 267, 375, 379, 380.

Elements and measure of compensation in eminent domain for temporary use and occupancy. 7 ALR2d 1297.

Supreme Court's views as to what constitutes "taking," within meaning of Fifth Amendment's prohibition against taking of private property for public use without just compensation. 89 L Ed 2d 977.

tiffs cross appealed from the order regarding costs and attorney fees. The appeals were consolidated.

The Court of Appeals *held:*

1. The trial court properly granted summary disposition on the basis that the director's administrative action constituted a compensable taking. By the exercise of its regulatory power, the government has so restricted the use of the plaintiffs' property rights that the plaintiffs have been deprived of all economically viable use. The plaintiffs' lawsuits were not premature. They did not have to apply for drilling permits or appeal the director's decision before claiming that their property had been taken.

2. The plaintiffs could not have been enjoined under nuisance law to refrain from exercising their rights to extract oil and gas on the ground that it might have had a detrimental effect on the surface property. Therefore, the defendants' contention that, even if a taking did occur, they need not pay compensation because development within the protected area could have been enjoined under nuisance law must be rejected.

3. The trial court did not clearly err in determining what the fair market value of the property was at the time of the taking. However, because the court erroneously equated market value with just compensation, the compensation award must be vacated and the action remanded to the trial court for further proceedings.

4. The trial court's findings regarding the pretaking cash value of the plaintiffs' property were not erroneous. However, the court erred in equating the pre-taking cash value of the plaintiff's property with how much the state must pay to justly compensate the plaintiffs for being deprived of the use of their property. Therefore, the judgment containing the compensation award must be vacated and the matter remanded to the trial court for further proceedings.

5. The plaintiffs have been indefinitely, not permanently, deprived of the use of their property. The taking at issue is fundamentally temporary in nature, and the just compensation award must reflect its temporary nature. The best approach is to base the just compensation award on the fair market rental value of the property. The court should also take into account other relevant factors such as enhancement in the value of plaintiffs' property not taken. The trial court in ordering the state to pay compensation for the full value of the property and requiring the plaintiffs to transfer their property rights to the state violated state law because the Uniform Condemnation Procedures Act, MCL 213.51 *et seq.*; MSA 8.265(1) *et seq.*,

provides the exclusive means by which government is empowered to judicially condemn and acquire property and the state has not proceeded under the act or done anything to justify a court order compelling the state to proceed under the act.

6. The trial court erred in awarding the plaintiffs attorney fees. There is no statutory provision for an award of attorney fees in this case because the taking did not include the actual acquisition of private property. Because the state did not actually acquire the property taken, but, rather, deprived the plaintiffs of all beneficial use of their property, the state cannot be forced to proceed under the Uniform Condemnation Procedures Act and its provision regarding attorney fees, MCL 213.66(2); MSA 8.265(16)(2).

7. The record is not clear with respect to whether the trial court properly calculated interest on the judgment. On remand, the court must make the appropriate calculations, specifying what portion of the judgment is just compensation and what part is interest.

8. The trial court had jurisdiction to enter an order amending the judgment to include an award of costs, interest, and attorney fees.

9. The trial court did not abuse its discretion in awarding the plaintiffs expert witness fees incurred in preparing for trial, even though those experts did not testify, or in using deposition transcripts and denying the defendants' motions to extend discovery and adjourn the trial.

Summary disposition affirmed, compensation judgment vacated, and case remanded for further proceedings.

1. EMINENT DOMAIN — COMPENSABLE TAKINGS — ADMINISTRATIVE LAW.

In the regulatory context, a compensable taking occurs when the government uses its power to so restrict the use of property that its owner has been deprived of all economically viable use.

2. EMINENT DOMAIN — UNIFORM CONDEMNATION PROCEDURES ACT — TEMPORARY TAKINGS.

The Uniform Condemnation Procedures Act defines the exclusive means by which government is empowered to judicially condemn and acquire property; a trial court may not compel the state to proceed under the act and judicially acquire property where the state's taking remains temporary in nature; an award of just compensation for a temporary taking must reflect its temporary nature (MCL 213.51 *et seq.*; MSA 8.265[1] *et seq.*).

3. EMINENT DOMAIN — DEPRIVING PROPERTY OWNER OF BENEFICIAL
USE — ACQUIRING PROPERTY — UNIFORM CONDEMNATION PRO-
CEDURES ACT.

The state merely by depriving a property owner of all beneficial
use of the property does not acquire the property; therefore, the
state in such a case cannot be compelled to comply with the
procedures of the Uniform Condemnation Procedures Act,
which defines the exclusive means by which government is
empowered to judicially condemn and acquire property (MCL
213.51 *et seq.*; MSA 8.265[1] *et seq.*).

*Mika, Meyers, Beckett & Jones* (by *John C. Jones, Fredric N. Goldberg, John M. DeVries,* and *Neil P. Jansen*), for Miller Brothers, Miller Brothers Oil Corporation, Peter C. Cook, D.A. Lubricant Company, Inc., Muskegon Development Company, Alpar Resources, Inc., Miller Energy, C.E. and Marilyn H. Jacobs, Victory Inc. of Michigan, Miller Oil Corporation, and Wolverine Gas & Oil Company, Inc.

*Warner, Norcross & Judd* (by *Douglas A. Dozeman, Harold S. Sawyer,* and *John H. Logie*), for Carnagel Oil Associates, Pinnacle Resources Company, Gerald A. and Jacklyn J. Derks, and William L. and Agnes K. Staley.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Thomas J. Emery,* Assistant in Charge, and *Gary L. Hicks,* Assistant Attorney General, for the defendants.

Amici Curiae:

*Smith, Haughey, Rice & Roegge* (by *Jon Vander Ploeg*); *Ronald A. Zumbrun, Edward J. Connor, Jr.,* and *James S. Burling,* for Pacific Legal Foundation.

*Roberts, Betz & Bloss* (by *David J. Bloss*); *Steven*

*J. Lechner* and *William Perry Pendley*, for Mountain States Legal Foundation and the Independent Petroleum Association of America.

*McNeil & Associates, P.C.* (by *John P. Forester*); *Olson & Noonan, P.C.* (by *James M. Olson* and *John D. Noonan*), for Hamlin Lake Association, West Michigan Environmental Action Council, Michigan Environmental Protection Foundation, Northern Michigan Environmental Action Council, and Tip of the Mitt Watershed Council.

Before: FITZGERALD, P.J., and NEFF and CONNOR, JJ.

CONNOR, J. In these inverse condemnation actions, we are asked to determine whether an administrative decision made by the director of the Department of Natural Resources effectively took plaintiffs' property, and, if so, whether the trial court correctly determined the amount the state must pay as just compensation. We conclude that plaintiffs' property was taken, but that the trial court did not correctly determine the amount of compensation owed. We affirm the summary disposition, vacate the compensation judgment, and remand for further proceedings consistent with this opinion.

I

On April 23, 1987, the director of the Department of Natural Resources, acting in his capacity as Supervisor of Wells, see MCL 319.3(1); MSA 13.139(3)(1), designated a 4,500-acre area in Mason County as the Nordhouse Dunes Area. He found that any oil or gas development in the area would constitute waste prohibited by law. MCL 319.4; MSA 13.139(4). He determined that no oil or gas

exploration or development would be permitted in the area.

Plaintiffs fall into two categories. Some are owners of oil and gas rights in the "protected" area. Others are developers who had leased oil and gas rights from the owners, and who had been preparing to develop the area's oil and gas potential. Plaintiffs filed inverse condemnation actions against the state, claiming that the director's decision effectively took their property from them. The trial court granted plaintiffs' motion for summary disposition, finding that the director's decision amounted to a taking. After a trial to resolve the issue of damages, the court awarded plaintiffs $71,479,000 as just compensation for the property taken, plus interest, costs, and attorney fees.

II

The state takes issue with the trial court's summary disposition ruling that the director's administrative action constituted a compensable taking. We affirm the trial court's grant of summary disposition.

Both our federal and state constitutions mandate that when private property is taken for public use, its owner must receive just compensation. US Const, Am V; Const 1963, art 10, § 2. In the regulatory context, a compensable taking occurs when the government uses its power to so restrict the use of property that its owner has been deprived of all economically viable use. See *Electro-Tech, Inc v H F Campbell Co*, 433 Mich 57, 68-69; 445 NW2d 61 (1989).

Plaintiffs' mineral interests in the Nordhouse Dunes Area had one, and only one, economically viable use: the extraction of any oil or gas that might be found under the land. To extract oil and

gas from the land, a well is needed. To be able to drill a well, a permit issued by the Supervisor of Wells is required. MCL 319.23; MSA 13.139(23). The director of the DNR is the Supervisor of Wells. MCL 319.3(1); MSA 13.139(3)(1). The director's administrative action made it clear that no permits would be issued for drilling in the protected area.[1] The director's action prevents plaintiffs from extracting any oil or gas from the land. Consequently, by the exercise of its regulatory power, the government had so restricted the use of plaintiffs' property rights that plaintiffs had been deprived of all economically viable use. Cf. *Silva v Ada Twp,* 416 Mich 153, 159-160; 330 NW2d 663 (1982).

The parties dispute whether the order prohibited directional drilling to get at oil and gas in the protected area from drilling sites located outside the protected area. Because the director's action was not unequivocal on this point, the trial court did not decide the issue on summary disposition.[2] Nevertheless, we find that summary disposition of the issue of whether a taking occurred was still proper. If allowed, directional drilling could not be used to extract all the oil and gas there may be under the protected area. Consequently, the director's action completely deprived plaintiffs of all use of at least some portion of their property holdings in the protected area. While there remained ques-

---

[1] The "Conclusive Findings and Determination of the Supervisor of Wells" stated:

> IT IS DETERMINED that hydrocarbon exploration or production and any and all developments, facilities, access corridors related thereto constitute waste and are therefore prohibited from [the protected area].

[2] After the trial regarding damages, the trial court found that the order did prohibit directional drilling. This finding is not clearly erroneous. MCR 2.613(C).

tions of fact about both the extent and the value of the property taken, the trial court decided neither issue on summary disposition.

It is also immaterial that all but one plaintiff have extensive property holdings outside the protected area. This case is not similar to the cases defendants cite wherein development of a portion of a parcel of land was limited or restricted. Cf. *Bevan v Brandon Twp,* 438 Mich 385; 475 NW2d 37 (1991). In this case, development of thousands of acres of property was totally prohibited.

The state contends that plaintiffs' lawsuits were premature, that they should have been required to apply for drilling permits or appeal the director's decision before claiming that their property had been taken. Again, we disagree. Applying for individual drilling permits would have been a futile gesture. Plaintiffs are not required to pursue futile remedies. Cf. *Michigan Waste Systems, Inc v Dep't of Natural Resources,* 157 Mich App 746, 758-759; 403 NW2d 608 (1987). The director's decision was final and absolute. As Supervisor of Wells, the director is the person empowered to decide whether to issue drilling permits; his decisions are final. They are not rendered less final because they are appealable. Moreover, plaintiffs do not have to exhaust administrative remedies that may have been available to challenge the decision. Their lawsuits are not a collateral attack on the director's decision, and do not seek to invalidate it. Regardless, the Natural Resources Commission (NRC) explicitly approved the findings and determination of the director two weeks after the decision at a commission hearing. Clearly, any appeal to the NRC seeking to invalidate the decision would also be an exercise in futility. *Id.*

III

The state contends that, even if a taking did

occur, it need not pay compensation because development within the protected area could have been enjoined under nuisance law. We disagree. Under nuisance law, plaintiffs could have been ordered to keep their activities from having a detrimental effect on adjoining property. However, the director expressly stated that his action was necessary in order to protect the surface owner's property.[3] Plaintiffs could not have been ordered to refrain from exercising their rights to extract oil and gas merely because it might have had some detrimental effect on the surface property: the surface owner had a contractual duty to allow plaintiffs to exercise their rights to extract oil and gas, even if it caused some harm to the surface property.[4]

IV

The central issue on appeal is the trial court's just compensation award. Generally, just compensation is determined by referring to the fair market value of the property taken. We find that the trial court did not clearly err in determining what the fair market value of the property was at the time of the taking. However, because the trial court erroneously equated market value with just compensation, we vacate the compensation award and remand for further proceedings consistent with this opinion.

A

Determining market value in this case is partic-

[3] This term is actually a misnomer. The "surface owner" in this case is the federal government, and it owns all the land, including everything below the surface, except what is owned by the mineral rights owners.

[4] The record shows that when the owners' predecessors conveyed the surface rights to the federal government, they retained the right to enter and disturb as much of the surface as would be necessary to prospect for and remove minerals.

ularly difficult, because the market for the property taken does not involve cash transactions.

No developer seeking to acquire oil and gas rights wants to pay more for them than they are worth, and no owner of oil and gas rights wants to be paid less for their rights than they are worth. Their worth depends on the quantity of oil and gas that can be extracted and sold. However, until wells are drilled and oil and gas are discovered, no one can know how much, if any, oil and gas there is under any particular parcel of land. Consequently, there is uncertainty about the value of "unproven" oil and gas rights.

This uncertainty inhibits both owners of rights and developers interested in acquiring those rights from engaging in cash transactions. Instead, owners lease their oil and gas rights to developers in exchange for a royalty interest in all oil or gas extracted. The developers pay for leases in part with cash "bonuses" and rents, but these amounts are almost always insignificant. This arrangement protects developers from paying too much and owners from receiving too little for oil and gas rights. However, it also provides no necessity for the market to ascertain with any degree of certainty the cash value of unproven oil and gas rights.

Defendants proposed that the trial court estimate the cash market value of the property by referring either to the cash bonuses and rents developers paid to the owners, or to the cash investors paid to buy into plaintiffs' development project. We believe the trial court properly rejected both approaches. Using the cash bonuses and rents paid fails to take into account the value of the royalty interest paid to the owners by the developers. On the other hand, the amounts of

money paid by investors was based strictly on the cost of exploration. Those amounts do not establish the worth of the development, which depends on the amount of oil and gas found, not on the costs of development.

Plaintiffs proposed that the trial court determine the cash market value of the rights taken by referring to the property's potential for oil and gas production. The trial court adopted this approach, and we agree that it appears to be the best way to determine a cash estimate of the property's market value in this case.

Although it is impossible to know whether there is oil and gas under the protected area without drilling wells, plaintiffs persuasively demonstrated that they almost certainly would have discovered some oil and gas had they been allowed to drill in the protected area.

Plaintiffs used regional data to support the expert opinions of the number of oil and gas strikes they would have had in the protected area. They used incomplete geological surveys suggesting a sufficient number of "anomalies" and their own drilling data showing how often anomalies they drill produce oil and gas to show that these opinions were reasonable. They used regional data to establish the average amount of oil and gas that is discovered by a successful well. They used industry and regional data to estimate the costs of development, the prices they would receive for oil and gas extracted, and likely production schedules. To determine the property's worth, they multiplied the likely number of strikes by the projected average strike size, subtracted estimated exploration and production costs, and then took projected production schedules into account to determine the present value of the income stream that would likely

have been produced had they been allowed to continue development of the area.

This approach is basically sound. Before the director's order, plaintiffs owned property of uncertain cash value. The order made it impossible to eliminate that uncertainty and determine the property's cash value. Under the circumstances, we cannot say that the trial court erred in determining that an appropriate way to estimate the value of the property is to consider the full range of possible values, assessing each by the relative likelihood that the property has that value. Plaintiffs' approach accomplishes this end. We affirm the trial court's findings regarding the pretaking cash value of plaintiffs' property.

### B

In awarding just compensation, the trial court equated the pretaking cash value of plaintiffs' property with how much the state must pay plaintiffs to justly compensate them for being deprived of the use of that property. The two are not the same. The trial court treated them as though they were identical. We find that this resulted in an erroneous determination of the amount the state must pay plaintiffs to compensate them. Consequently, we vacate the judgment and remand for further proceedings consistent with this opinion.

The purpose of just compensation is to put property owners in as good a position as they would have been in had their property not been taken from them. *State Hwy Comm'r v Eilender*, 362 Mich 697, 699; 108 NW2d 755 (1961). The public must not be enriched at the property owners' expense. *Id.* But neither should property owners be enriched at the public's expense. *Id.*

To prevent either side from being enriched at

the other's expense, it is important to consider the nature of the taking at issue. In a typical condemnation case, the state takes some affirmative action to permanently deprive a property owner of the use of the property, and, therefore, is required to pay compensation to the owner. Compensation is determined by estimating what a willing buyer would have paid for the property had the owner been willing to sell it. This prevents either side from being unjustly enriched, because included in the sale price of property is compensation for a seller being forever deprived of the use of the property.

However, in this case, plaintiffs have not been *permanently* deprived of the use of their property, but, rather, *indefinitely* deprived of the use of their property.[5] The taking at issue is fundamentally temporary in nature. All the oil and gas that was under the protected area in April 1987 will remain there until the director permits its removal. The ban the director placed on drilling in the protected area could be lifted at any time. The ban was not mandated by law, and depends on factual findings that the director can reexamine at his discretion. If the director were to lift the ban on drilling in the area, plaintiffs would be able to use their property as if it had never been taken from them.

The possibility that the drilling ban could be canceled in the future is a serious obstacle to determining just compensation. If plaintiffs are given anything less than compensation for the full value of the property in anticipation that the ban may be lifted but the director never lifts the ban,

---

[5] There is one minor exception. Almost all of the leasehold interests had a force majeure clause, which extends their terms indefinitely. But there is one small parcel of land that had no such clause, and that lease has now expired. On remand, the trial court shall consider the value of this leasehold lost separately.

the public will have been enriched at plaintiffs' expense. On the other hand, if plaintiffs are given compensation for the full value and the director cancels the ban at some point in the future, plaintiffs will have been enriched at the public's expense.

The trial court avoided this obstacle by converting the temporary taking to a permanent one: it ordered the state to pay compensation for the full value of the property and required plaintiffs to transfer their property rights to the state. While this solves the problem of either side being enriched at the other's expense, it does so by violating state law.

The Uniform Condemnation Procedures Act (UCPA), MCL 213.51 *et seq.*; MSA 8.265(1) *et seq.*, defines the exclusive means by which government is empowered to judicially condemn and acquire property. MCL 213.75; MSA 8.265(25). Thus far, the state has not chosen to proceed under the UCPA, nor has it done anything that would justify a court order compelling the state to proceed under that act.[6] Nevertheless, the trial court's judgment orders the judicial acquisition of plaintiffs' property. We find the trial court's order violates the UCPA's exclusivity provisions.

Having determined that the trial court cannot order the state to acquire plaintiffs' property, the taking remains temporary in nature, and the just compensation award must reflect its temporary nature. In cases involving a temporary taking, the best approach is a flexible approach that will compensate for losses actually suffered while avoiding the threat of windfalls to plaintiffs at the expense of substantial government liability. *Poirier v Grand Blanc Twp (After Remand)*, 192 Mich

---

[6] See *infra*, part V.

App 539, 545; 481 NW2d 762 (1992). Rather than basing just compensation on the fair market sale value, which treats the taking as though it were permanent, we believe the best approach in this instance is to base the just compensation award on the fair market rental value of the property.

Property owners who rent out their property are temporarily deprived of its use in exchange for rent payments. Because the state is temporarily depriving plaintiffs of the use of their property we conclude that, much like a renter, the state should be required to pay "rent" to plaintiffs as compensation for this temporary deprivation. See *W H Pugh Coal Co v Wisconsin,* 157 Wis App 2d 620; 460 NW2d 787 (1990); see also *Poirier, supra,* 544. As long as the director's order continues to prevent plaintiffs from exercising their property rights, the state's obligation to pay "rent" must continue.

We recognize that there is almost certainly no true rental market to look to for guidance. The lease market for oil and gas rights is driven by the desire to develop, not delay development. However, in the absence of other evidence, it is reasonable to infer that, because the "renter" is not diminishing the value of the property by extracting oil or gas, in all likelihood the fair rental value will simply be a function of the purchase value and market interest rates. Plaintiffs have property that in 1987 was estimated to be capable of producing an income stream with a value of over $70 million, if developed. What rent would someone with such an asset, who is in a position to develop it, have charged for delaying development? More than likely, something close to the amount of money

they could have received in interest on present value of the income stream.[7]

Moreover, although the rental value of the property taken is an important factor to consider in determining just compensation in this case, it is just one of several factors that must be considered. For example, just compensation should take into account enhancement in the value of property not taken. See MCL 213.73; MSA 8.265(23). In this case, the value of plaintiffs' property outside the protected area has been enhanced by the director's order, because it has been developed sooner than it would have been absent the taking.

We remand this case to the trial court for a determination of the fair rental value of the property taken and, considering that and other relevant factors, a determination of what compensation the state must pay for preventing plaintiffs from using their property.

v

The state contends that the trial court erred in awarding plaintiffs attorney fees. We agree.

As noted previously, the Uniform Condemnation Procedures Act deals with the acquisition of property. MCL 213.75; MSA 8.265(25). When the state converts private property for its own use without first paying for it, it is not only acting unconstitutionally, it is also violating the UCPA by acquiring property without complying with that statute's

---

[7] This discussion is not meant to limit the proceedings on remand, only to provide some guidance to the trial court and the parties on how to proceed. The parties remain free to offer whatever evidence and advance whatever arguments regarding the rental value of the property they believe are relevant, and the trial court remains free to make its decision on the basis of the evidence and the arguments presented.

exclusive procedures.[8] However, when the state affects a taking merely by depriving an owner of all beneficial use of property, the state does not *acquire* the property "taken." Such a taking may violate the constitution, but it does not violate the UCPA. Consequently, the state cannot be compelled to invoke the UCPA. And if it cannot be forced to proceed under the statute, then the UCPA's provision regarding attorney fees is not applicable.

Absent statutory provision for actual reasonable attorney fees, they are not awardable in a takings case. *Muskegon v Slater,* 379 Mich 466; 152 NW2d 652 (1967); see most recently *Jack Loeks Theatres, Inc v Kentwood,* 189 Mich App 603, 616-617; 474 NW2d 140 (1991), vacated in part 439 Mich 968 (1992). Because this case involves a taking that did not include the actual acquisition of private property, attorney fees are not properly awardable.

VI

The state challenges the trial court's interest award. A person has a constitutional right to interest from the date of a taking until the date of compensation. *In re Petition of State Hwy Comm'r,* 279 Mich 285; 271 NW 760 (1937). From the date of the taking until the date the complaint is filed, the proper interest rate to apply is the legal rate defined in MCL 438.31; MSA 19.15(1). See *In re Petition, supra.* From the date the complaint is filed until the date judgment is entered, the applicable interest rate is governed by MCL 600.6455; MSA 27A.6455. Of course, interest on periodic rent payments would not begin to accrue until the rent payments are due. The record does

[8] In such a situation, property owners not only have a constitutional right to "just compensation," they also have a right to force the state to proceed under the UCPA. And under the UCPA, attorney fees are awardable. MCL 213.66(2); MSA 8.265(16)(2).

not make it clear whether the trial court calculated interest on the judgment properly. On remand, the trial court will make the appropriate calculations, specifying what portion of its judgment is just compensation and what part is interest.

VII

The state contends that the trial court lacked jurisdiction to amend the judgment to include costs, interest, and attorney fees because it had already filed a claim of appeal in this Court. We disagree. The record demonstrates that the claim of appeal was filed prematurely, because the order appealed from was not a final judgment. We note that this does not affect our jurisdiction to decide this case because defendants also filed a claim of appeal from the order that was the final judgment.

Finally, we find no abuse of discretion in the trial court's award of plaintiffs' expert witness fees incurred in preparing for trial, even though those experts did not testify. See *Herrera v Levine,* 176 Mich App 350, 357-358; 439 NW2d 378 (1989). We also find no abuse of discretion in the trial court's use of deposition transcripts or its denial of defendants' motions to extend discovery and adjourn the trial.

Summary disposition affirmed, compensation judgment vacated, and case remanded for further proceedings.